UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DAVID BURMANIA,

        Plaintiff,

v.

THE HARTFORD,

        Defendant.
_____/

File No. 1:12-CV-1244

HON. ROBERT HOLMES BELL

**O P I N I O N**

In this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, Plaintiff challenges Defendant's denial of Plaintiff's claim for long-term disability benefits. This matter is currently before the Court on the parties' cross-motions for entry of judgment on the administrative record. For the reasons that follow, the Court will affirm the administrator's decision to deny benefits.

**I.**

Plaintiff David Burmania, was employed by YRC Worldwide, Inc. ("YRC") from March 1998 to December 2009 as an Outbound Supervisor and Operations Supervisor. (AR 16-5, pp. 26.)[1] As an employee of YRC, Plaintiff was eligible for coverage under the YRC Group Long Term Disability Plan. The Plan was insured by a group disability insurance

---

[1] References to "AR" are to the Administrative Record. (Dkt. Nos. 16-1 – 16-5, and 17-1 & 17-2.)

policy (the "Policy") issued by Defendant Hartford Life and Accident Insurance Company[2] ("Hartford").

The Policy provides for both short term disability ("STD") benefits and for long term disability ("LTD") benefits. During the term of STD benefits and for 24 months thereafter, the ERISA Plan defines "Disability" as the inability to perform one's "own" occupation. Thereafter, "disability" is defined as the inability to perform "any occupation."[3]

Plaintiff has a history of atrial fibrillation, hypertension, type 2 diabetes mellitus with polyneuropathy, depression, nephrolithiasis, and a history of smoking. (AR 17-2, p. 89.) In July 2009, Plaintiff went on disability leave due to worsening low back and leg pain, difficulty negotiating steps, and increased falling. (AR 17-2, p. 91.) At that time Plaintiff was 58 years old. Plaintiff was approved for Short Term Disability ("STD") benefits from

---

[2]Defendant is identified on the complaint as "The Hartford."

[3]The ERISA Plan provides:

**Disability** or **Disabled** means You are prevented from performing one or more of the Essential Duties of
1) Your Occupation during the Elimination Period;
2) Your Occupation, for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
3) after that, Any Occupation.

(AR 16-1, p. 32.) "Any Occupation" is defined as "any occupation for which You are qualified by education, training or experience that has an earning potential of greater than the lesser of: (1) 50% of Your Indexed Pre-disability Earnings and the benefit Percentage; or (2) the Maximum Monthly Benefit." (AR 16-2, p. 32.)

Hartford beginning in July 2009. (AR 17-1, p. 17.) In October 2009, Plaintiff applied for LTD benefits. (AR 16-2, 82; AR 17-2, pp. 54-56.) He reported that he his job only allowed him to sit 75% of the time and required going up and down stairs on a regular basis. (AR 16-2, p. 180). Plaintiff was approved for Long Term Disability ("LTD") benefits commencing January 1, 2010, under the "own occupation" definition of disability. (AR 16-4, p. 4; AR 17-2, pp. 43-46.) Plaintiff was also awarded Social Security disability benefits beginning January 2010. (AR 17-2, p. 38.)

On January 1, 2012, after Plaintiff had been receiving LTD benefits for two years, Plaintiff's own occupation period ended, and the Plan required Plaintiff to satisfy the "any occupation" definition of disability in order to remain eligible for benefits. (AR 16-3, p. 5.) Defendant began the review process in July 2011. (AR 16-3, p. 14.) When Defendant contacted Dr. Murphy, Plaintiff's treating doctor, regarding Plaintiff's limitations and restrictions, on July 11, 2011, Dr. Murphy stated that he could not assess Plaintiff's functional capacity and that it should be done by a physical therapist. (AR 16-2, p. 55; AR 16-3, p. 18.) However, on October 14, 2011, Dr. Murphy did return a form provided by Defendant on which he checked the box indicating that he did not believe Plaintiff was capable of engaging in full-time sedentary work. (AR 16-5, p.73-74.)

Defendant scheduled Plaintiff for a functional capacity evaluation ("FCE") with an occupational therapist on November 8, 2011. (AR 16-5, p. 75.) Plaintiff appeared for his scheduled FCE, but was unable to be evaluated because his blood pressure was elevated.

3

(AR 16-5, p. 84.) Because the FCE was cancelled, Defendant referred Plaintiff for an Independent Medical Examination ("IME") by Dr. Amanda Huver, a doctor of internal medicine. (AR 16-5, p. 101.) After reviewing Plaintiff's medical records, and conducting a physical examination of Plaintiff on December 5, 2011, Dr. Huver opined that Plaintiff could sit for one hour at a time with one-minute breaks every hour to stand and stretch in an eight-hour workday, stand for 10 minutes once in an eight-hour work day, and walk with a cane one minute at a time up to ten times in an eight-hour work day. (AR 16-5, pp. 10-11.) A vocational rehabilitation clinical case manager completed an Employability Analysis based on the functional capabilities identified by Dr. Huver, and concluded that Plaintiff could perform certain occupations that involved mostly administrative and clerical work that exist in reasonable numbers in the national economy. (AR 16-4, pp. 88-91.) On December 27, 2011, after reviewing all of these records, Defendant sent Plaintiff a letter denying Plaintiff's claim for continued LTD benefits. (AR 16-3, pp. 25-29.) Defendant advised that Plaintiff did not meet the policy definition of Disability beyond January 1, 2012, because Plaintiff was not prevented from performing the essential duties of "any occupation." (*Id.*)

Plaintiff filed an administrative appeal of the denial of LTD benefits on February 27, 2012. (AR 16-4, pp. 83-87.) Although Plaintiff expressed disagreement with Dr. Huver's assessment of his functional capacity, Plaintiff did not submit any additional documentation in connection with the appeal. (AR 16-4, pp. 16-18.)

In conjunction with the appeal process, Defendant obtained updated records from Dr.

Murphy and new records from Dr. Cronin, a cardiologist, and Dr. Kraker, a pulmonologist. Defendant submitted the medical records to Tanisha K. Taylor, MD for an independent medical review. Dr. Taylor is certified not only in internal medicine, but also in occupational and preventative medicine. (AR 16-4, p. 15.) On April 20, 2012, after reviewing Plaintiff's medical records and conducting interviews with each of Plaintiff's treating physicians, Dr. Taylor completed a comprehensive report for Defendant. (AR 16-4, pp. 7-15.) Dr. Taylor determined that the medical records supported the treating physicians' diagnoses that Plaintiff suffered from multiple medical conditions including diabetes, hypertension, high cholesterol, obstructive sleep apnea, moderate chronic obstructive pulmonary disease, coronary artery disease, and chronic back pain, but disagreed with their assertions that he was disabled from performing "any occupation." (AR 16-4, pp. 7-15.) Dr. Taylor concluded that Plaintiff could sit for up to one hour at a time, for up to six hours, with the ability to reposition as needed for comfort, and that he could stand or walk for up to 30 minutes at a time, for up to four hours with an assistive device. (AR 16-4, p. 13.) She found that the medical evidence did not support any impairment, restrictions, or limitations related to Plaintiff's medications. Dr. Taylor concluded that Plaintiff was able to sustain a regular work schedule of eight hours per day for five days a week within the restrictions and limitations she outlined. (AR 16-4, p. 13.) By letter dated April 30, 2012, Defendant upheld the termination of Plaintiff's LTD benefits. (AR 16-3, pp. 37-42.) Plaintiff then filed this action pursuant to Section 502(a) of ERISA.

**II.**

A denial of ERISA benefits is "reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 566 (6th Cir. 2013) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "If the administrator or fiduciary can show it has such discretionary authority, a benefits denial is reviewed under the arbitrary and capricious standard." *Id.* (citing *Haus v. Bechtel Jacobs Co.*, 491 F.3d 557, 561-62 (6th Cir. 2007))

The ERISA plan at issue in this case gives the plan administrator discretion in interpreting the terms of the plan and in making benefits determinations. (AR 16-1, p. 43 ("The Plan has granted the Insurance company full discretion and authority to determine eligibility for benefits and to construe and interpret tall terms and provisions of the Policy.")). Plaintiff conceded in the joint status report that the standard of review is arbitrary and capricious. (Dkt. No. 14, Jt. Status Rpt. ¶ 14.) However, notwithstanding the discretionary language of the Plan and Plaintiff's prior concession that the case would be decided under the arbitrary and capricious standard of review, Plaintiff now contends that the *de novo* standard of review applies because the policy was issued after the Michigan Office of Financial and Insurance Services ("OFIS") promulgated rules prohibiting an insurer from issuing any policy that contains a discretionary clause. Mich. Admin. Code Rules 500.2201-

6

500.2202.[4] Plaintiff contends that because the insurance contract was issued after the rules took effect, the discretionary language in the policy is void and of no effect, and the Court should accordingly apply the *de novo* standard of review.

In *American Council of Life Insurers v. Ross*, 558 F.3d 600 (6th Cir. 2009), the Sixth Circuit held that ERISA does not preempt state administrative rules that prohibit discretionary clauses, and that ERISA plans in Michigan are accordingly subject to Michigan's rules regarding discretionary clauses. *Id*. at 609. "Therefore, any ERISA plans issued or amended after July 1, 2007 require 'de novo review of denials of ERISA benefits within Michigan.'" *Rice-Peterson v. Unum Life Ins. Co. of Am.*, No. 11-14565, 2013 WL 1250457, at *8 ( E.D. Mich. Mar. 26, 2013) (quoting *Gray v. Mut. of Omaha Life Ins. Co.*,

---

[4]The Rules provide in pertinent part:

(b) On and after the first day of the first month following the effective date of these rules, an insurer shall not issue, advertise, or deliver to any person in this state a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause. This does not apply to a contract document in use before that date, but does apply to any such document revised in any respect on or after that date.

(c) On and after the first day of the first month following the effective date of these rules, a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect. This does not apply to contract documents in use before that date, but does apply to any such document revised in any respect on or after that date.

Mich. Admin. Code Rule 500.2202. The rules took effect June 1, 2007. *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 603 (6th Cir. 2009)

No. 11-15016, 2012 WL 2995469, at *3 (E.D. Mich. July 23, 2012)).

Defendant contends that the Michigan rules prohibiting discretionary clauses do not apply in this case because the Policy was not issued or delivered in Michigan and is not a "transaction of insurance" that is subject to the Michigan Insurance Code. *See* Mich. Comp. Laws § 500.402b(d) (excluding transactions of group insurance in which a master policy was lawfully issued to an employer located in another state for the benefit of employees residing in this state from the requirements of the Michigan insurance code).

The Court agrees. By their terms, the rules prohibiting discretionary clauses only apply to policies issued or delivered to "any person in this state." *See* Mich. Admin. Code Rule 500.2202(b), (c). The Disability Policy at issue in this case was not issued to Plaintiff, but to YRC Worldwide, Inc., a corporation with its principal place of business in Kansas. (AR 16-1, pp. 41-42.) The contract was delivered in Kansas (AR 16-1, p.1), and covers YRC's employees throughout the nation, not only in Michigan (AR 16-1, p. 20). *See Foorman v. Liberty Life Assur. Co. of Boston*, 1:12-CV-927, 2013 WL 1874738, at *3 (W.D. Mich. May 3, 2013) (Neff, J.) (declining to apply Michigan law to a group insurance contract with Comcast, an employer located in Pennsylvania). Because the Policy was not issued or delivered in Michigan and is not governed by Michigan law, the Michigan administrative rules prohibiting discretionary clauses do not apply.

Because the Policy contains the requisite grant of discretionary authority to the plan administrator, the plan administrator's decision to deny benefits will be reviewed under the

8

arbitrary and capricious standard. The "highly deferential" arbitrary and capricious standard is the "least demanding" standard of judicial review of administrative action. *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 657-58 (6th Cir. 2013). Under this standard, the court will uphold a benefits determination if it is "rational in light of the plan's provisions." *Id.* (quoting *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)). Application of this standard, however, does not require the court merely to rubber stamp the administrator's decision. *Jones*, 385 F.3d at 660-61. The administrator's decision will be upheld only "'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Helfman v. GE Grp. Life Assur. Co.*, 573 F.3d 383, 392 (6th Cir. 2009) (quoting *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552 (6th Cir. 2008)).

## III.

Plaintiff contends that the denial of his claim for long term disability benefits was arbitrary and capricious because Defendant did not have any rational basis for ignoring the opinions of his treating physicians, Dr. Forsch, Dr. Murphy, and Dr. Kraker, in favor of the flawed opinions of non-treating physicians, Dr. Huver and Dr. Taylor.

There is no dispute that Plaintiff suffers from multiple objectively verified medical conditions including radiculopathy, diabetic polyneuropathy, COPD, and cardiac impairment. Neither is there any dispute that his conditions cause him pain and limit his ability to walk, stand, squat, and bend. The only issue presented in this appeal is whether Defendant's conclusion that those medical problems do not prevent Plaintiff from performing sedentary

work was arbitrary and capricious.

Under the Policy, after the first twenty four months on LTD, Plaintiff was not "disabled" if he could perform the essential duties of "any occupation" for which he was reasonably qualified. Plaintiff bore the burden of presenting evidence that he was disabled under the "any occupation" definition of disability. Plaintiff presented the opinions of three of his treating physicians regarding his ability to work.

In July 2009, Dr. Forsch reported to Defendant on the Attending Physician's Statement of Functionality form that Plaintiff could sit for a half hour at a time for up to six hours a day, stand for a half hour at a time for up to four hours a day, and walk for a tenth of an hour at a time for up to one hour a day. (AR 17-2, pp. 102-03.) On October 8, Dr. Forsch revised his assessment of Plaintiff's functional capacity, indicating that Plaintiff could sit for a half hour at a time for up to six hours a day, stand for a half hour at a time for only 1 hour a day, and that he could not walk, bend, or lift. (AR 17-2, p. 67.) Dr. Forsch gave no explanation on the form for the change in Plaintiff's functionality with respect to standing and walking. Neither do his notes suggest a basis for the change. Dr. Forsch indicated in his notes from Plaintiff's September 3, 2009, visit that Plaintiff had "some obvious pain on movement," but that he was "in no acute distress," and his "back and leg pain are unchanged since his last visit." (AR 17-2, p. 19.) He indicated that Plaintiff had reported several recent incidents when his legs gave way unexpectedly leading to falls, but that he thought the falls could be avoided if Plaintiff used his cane more consistently. (*Id.*) Dr. Forsch indicated in

10

his notes from Plaintiff's following visit on October 8, 2009, that Plaintiff had "no new complaints." (AR 17-2, p. 21.) He did note, however, that Plaintiff was working on obtaining permanent disability benefits from Defendant and had presented a form for Dr. Forsch to complete and return to Defendant. (*Id.*) In December 2009, Dr. Forsch advised Defendant that Plaintiff's back condition impaired Plaintiff's ability to work, that it was expected to last his lifetime, that he was unable to return to work, and that his back problem would not resolve to allow him to walk. (AR 17-2, p. 48.) At the time Dr. Forsch certified that Plaintiff was unable to return to work, Plaintiff's disability status was being evaluated under the "own occupation" definition of disability. Defendant did not disagree with Dr. Forsch's assessment that Plaintiff was unable to return to his own occupation, and provided Plaintiff with two years of long term disability benefits under the "own occupation" definition of disability.

In 2010, Plaintiff transferred his primary care from Dr. Forsch to Dr. Murphy. On January 27, 2011, Dr Murphy advised Defendant that Plaintiff remained disabled and could not return to work. Dr. Murphy opined that in the general workplace environment Plaintiff was capable of sitting for 30 minutes at a time for 4 to 8 hours day, but that Plaintiff could not stand or walk at all. (AR 16-5, p. 39.) On July 11, 2011, in response to an inquiry from Defendant, Dr. Murphy advised that he could not complete a functional capacity examination of Plaintiff. It would have to be done by a physical therapist, and Plaintiff was not seeing one. (AR 16-2, p. 55.) On October 13, 2011, Dr. Murphy indicated in his notes that he

11

discussed the Hartford disability form, that Plaintiff "does not believe he is capable of doing the performance so stated in that document," and that he had "no reason to believe that patient is being dishonest with me." (AR 16-4, p. 53.) The following day, Dr. Murphy checked "no" in response to Defendant's inquiry as to whether Plaintiff was capable of engaging in sedentary type activity which involved sitting most of the time with occasional walking or standing for brief periods during an 8 hour day. (AR 16-5, pp. 72-73.) Dr. Murphy did not provide any explanation for his response. (*Id.*)

On January 27, 2012, Dr. Murphy indicated on a functional capacity evaluation form that Plaintiff can sit for 30 minutes at a time for a total of four hours, that he had no noted restrictions regarding lifting up to ten pounds, that he is not to bend at the waist due to his back pain, that he is not to kneel or crouch, that he can drive up to 45 minutes, that he is never to reach above his shoulder, that he can reach at the waist/desk level frequently, that he can reach below the waist/desk level occasionally, and that he can occasionally finger and handle. (AR 16-4, p. 9.) However, when Dr. Taylor spoke with Dr. Murphy on April 5, 2012, Dr. Murphy stated that he did "not think that he is necessarily qualified to assert the claimant's capabilities in terms of how many hours he could sit, stand or walk," and that a "functional capacity evaluation may help to clarify the claimant's abilities." (AR 16-4, p. 11.) Dr. Murphy felt that his role was more to keep Plaintiff healthy. (*Id.*)

Dr. Huver and Dr. Taylor concluded, in contrast to Plaintiff's treating physicians, that Plaintiff was capable of sedentary work. Defendant relied on the opinions of Dr. Huver and

Dr. Taylor when it terminated Plaintiff's benefits. Plaintiff contends that the Court should view the opinions of Dr. Huver and Dr. Taylor with some skepticism because they were paid by Defendant to review Plaintiff's claim for disability benefits.

Under ERISA, there is no deference accorded to treating physicians. *Evans v. UNUM Provident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006). Although a plan may not summarily reject the opinions of a treating physician, it may adopt an alternative opinion as long as it gives reasons for doing so. *Elliott v. Metro. Life Ins. co.*, 473 F.3d 613, 620 (6th Cir. 2006) Courts have recognized that when a Plan Administrator's explanation is based on the work of a doctor in its employ, the court should view the explanation with some skepticism. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381-82 (6th Cir. 2005). Even if the reviewing doctors are independent, if they are repeatedly retained by the benefit plan, they may have an incentive to make a finding of "not disabled" in order to preserve their consulting arrangements. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003). Because of the possibility of a conflict, this Court may consider whether an independent physician retained by Defendant had an incentive to make a finding of "not disabled" as a factor in determining whether Defendant acted arbitrarily and capriciously in deciding to credit the opinion of its paid, consulting physician. *Kalish v. Liberty Mut.*, 419 F.3d 502, 508 (6th Cir. 2005).

In addition, where, as here, "a plan authorizes an administrator 'both to decide whether an employee is eligible for benefits and to pay those benefits,' it creates 'an apparent

conflict of interest.'" *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007) (quoting *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006)). In light of the potential conflict, the reviewing court should look "to see if there is evidence that the conflict in any way influenced the plan administrator's decision." *Evans v. UnumProvident Corp*., 434 F.3d 866, 876 (6th Cir. 2006).

An alleged conflict of interest is a relevant factor that the court must take into consideration in determining whether Defendant's decision was arbitrary and capricious. *Cooper*, 486 F.3d at 165. However, "Sixth Circuit caselaw requires a plaintiff not only to show the purported existence of a conflict of interest, but also to provide 'significant evidence' that the conflict actually affected or motivated the decision at issue." *Id.*

Dr. Huver and Dr. Taylor are independent physician consultants and are not in-house reviewing physicians. The only evidence Plaintiff has produced to show their bias is that they were employed by Defendant and gave opinions that benefitted Defendant. This is not a sufficient basis for suggesting that their professional opinions were motivated by a conflict of interest. There is no evidence that Dr. Huver or Dr. Taylor was repeatedly hired by Defendant, that either one of them gave opinions that were not medically supportable, or that Defendant attempted to tamper with or inappropriately influence their evaluations. The Court finds nothing in the record that would lead it to conclude that Defendant acted arbitrarily and capriciously in relying upon Dr. Huver and Dr. Taylor's opinions.

Even if the reviewing doctors did not have a conflict of interest, Plaintiff contends

Defendant's reliance on Dr. Huver's opinion regarding his functional capacity was arbitrary and capricious because Dr. Huver was a doctor of internal medicine, not an occupational therapist, orthopedist, cardiologist, or pulmonologist.

Defendant attempted to have Plaintiff undergo a functional capacity examination by an occupational therapist (AR 16-5, p. 100), but was unable to do so because of Plaintiff's elevated blood pressure on that date.[5] It was only when Plaintiff was unable to complete the FCE that Defendant referred Plaintiff to Dr. Huver. Defendant's reliance on Dr. Huver was not arbitrary and capricious because she shared the same specialty as Dr. Murphy, the primary care physician Plaintiff was relying on to establish that he was unable to perform a sedentary occupation.

Plaintiff also contends that Dr. Huver's opinion was flawed because she determined that his respiratory function was "normal" and that his cardiovascular function was "essentially normal." (AR 16-4, pp. 19-22.) Plaintiff faults Dr. Huver for "second-guessing" the findings of his specialist who determined that he had complete blockage of one artery and 60% blockage of the other, and COPD. (Dkt. No. 19, Pl.'s Br. 4, 15 (citing AR 16-4, p. 34, Dr. Murphy's Progress Notes of 02/29/12).)

Contrary to Plaintiff's assertions, Dr. Huver did not ignore or second-guess Plaintiff's treating specialists. The Progress Notes that Plaintiff relies on concern a February 29, 2012,

---

[5] Plaintiff's blood pressure was not always elevated. Dr. Murphy noted during subsequent office visits that Plaintiff's blood pressure was in normal ranges and well controlled (AR 16-4, pp. 34, 35, 45; AR 16-5, p. 10.)

15

appointment that had not yet occurred when Dr. Huver made her findings. At the time Dr. Huver met with Plaintiff and made her findings, Plaintiff had not yet been referred to or evaluated by either Dr. Kraker, the pulmonolgist, or by Dr. Cronin, the cardiologist. Plaintiff did not see these specialists until he began the process of appealing Defendant's denial of benefits. Moreover, Dr. Huver's findings are consistent Plaintiff's January 25, 2012, echocardiogram which indicated that Plaintiff's ejection fraction in his left and right ventricular systolic functions were within normal limits. (AR 16-4, p. 80.) They are also consistent with Dr. Murphy's finding on January 19, 2012, that Plaintiff's lungs were clear to auscultation bilaterally, with good air exchange. (AR 16-4, p. 35.)

Finally, Plaintiff contends that Dr. Huver's opinion is flawed because she made unsupported assumptions that he could sit for an hour at a time. Dr. Huver noted in her report that although Plaintiff claimed to be able to sit only 20 to 30 minutes at a time, he spent 45 minutes sitting in the waiting room filling out forms, he sat for one-and-a-half hours in the examination room, he had driven himself to the appointment – an hour trip – without stopping, and he reported that he had recently been able to watch a two-hour football game. (AR 16-5, pp. 10-11.) Plaintiff contends that Dr. Huver simply assumed that he had been sitting the entire time during each of these activities when in fact she did not know how often he got up while in the waiting room and while watching the football game. He also notes that Dr. Huver failed to report that she did not require him to sit for the entire duration of his physical examination.

16

Dr. Huver's conclusion that Plaintiff could sit for an hour at a time was based on a variety of reports and observations. Her conclusion was supported by greater detail and explanation than the contrary opinion of Dr. Murphy. Under these circumstances, the Court cannot say that Defendant's reliance on Dr. Huver's findings was arbitrary and capricious

Contrary to Plaintiff's assertions, Dr. Taylor did not simply rubber stamp Dr. Huver's opinion. Dr. Taylor obtained additional reports from Plaintiff's treating physicians and personally contacted them to discuss Plaintiff's condition. Whereas Dr. Huver concluded that Plaintiff could sit for up to eight hours with a one-minute break every hour, Dr. Taylor concluded that Plaintiff had the ability to sit for one hour at a time for up to six hours in an eight-hour day (AR 16-4, p. 13.) Contrary to Plaintiff's assertions, Dr. Taylor did not ignore or second-guess Plaintiff's cardiac and pulmonary specialists. Plaintiff's pulmonologist, Dr. Kraker, determined in February 2012, that Plaintiff suffered moderate chronic obstructive pulmonary disease ("COPD"), and suspected sleep apnea. (AR 16-4, pp. 65-70.) However, he advised Dr. Taylor that "from a strictly pulmonary standpoint, the claimant is probably not impaired, and could work purely at the sedentary duty level." He cautioned, however, that "with the claimant's multiple health issues, including the cardiac issues, he doubted that the claimant could return to work without first being stabilized." (AR 16-4, pp. 11-12.)

Dr. Taylor checked with Dr. Cronin, Plaintiff's cardiologist, but Dr. Cronin's report did not support a finding that Plaintiff was prevented from sedentary employment. Dr. Cronin advised that she had only seen Plaintiff on one occasion. Plaintiff's cardiac

catheterization demonstrated an occlusion of the right coronary artery, but his ejection fraction was normal. Dr. Cronin advised that she had not seen Plaintiff in follow-up as was recommended. (AR 16-4, p. 11.)

Finally, Plaintiff contends that Defendant's denial of long term disability benefits was arbitrary and capricious because it was contrary to the Social Security Administration's determination of disability.

An SSA determination of disability is not binding, but some weight is to be given to an SSA determination that an applicant is disabled and unable to work. *Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 F. App'x 511, 518 (6th Cir. 2006).

> T]he SSA's disability determination does not, standing alone, require the conclusion that [the insurer's] denial of benefits was arbitrary and capricious. The SSA determination to award benefits . . . is, instead, just one factor the Court should consider, in the context of the record as a whole, in determining whether [the insurer's] contrary decision was arbitrary and capricious

*Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). As noted by the Supreme Court, there are critical differences between the Social Security disability program and ERISA benefit plans. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003). For example, while the SSA accords "special deference" to the opinions of treating physicians and measures the claimant's condition against a uniform set of federal criteria, the same is not true of ERISA plans. *Id.* at 833. Moreover, the burden of proof differs. In an SSA proceeding, the burden is on the government to show that the applicant can work, whereas under the Policy the applicant bears the burden of proving that he cannot work.

18

*Tracy*, 195 F. App'x at 518; *see also* AR 16-1, pp. 28-29 (requiring applicant to provide proof of loss). Finally, as Defendant noted in its letter upholding its decision on appeal, in contrast to Social Security, the Policy does not treat advancing age as a limiting factor in the definition of Disability and does consider the transferability of one's skills to other occupations. (AR 16-3, p. 41.)

Defendant's decision to credit the opinions of Dr. Huver and Dr. Taylor over Dr. Murphy regarding Plaintiff's functional capacity is not unreasonable in light of Dr. Murphy's admitted reluctance to assess Plaintiff's functional capacity and his lack of any objective evidence or explanation supporting his findings regarding Plaintiff's ability to sit, stand or walk. The Court is satisfied that Defendant provided a reasoned explanation for its termination of long term disability benefits and that its determination that Plaintiff was not prevented from performing one or more of the essential duties of "any occupation" was not arbitrary or capricious. Accordingly, Defendant's decision to terminate Plaintiff's long term disability benefits will be affirmed.

An order and judgment consistent with this opinion will be entered.


Dated: December 12, 2013  /s/ Robert Holmes Bell
ROBERT HOLMES BELL
UNITED STATES DISTRICT JUDGE